LAW OFFICE OF SHAWN R. PEREZ
Shawn R. Perez (NV SBN: 10421)
Shawn711@msn.com
7121 W. Craig Rd, #113-38
Las Vegas, NV  89129
T: 702-485-3977
F: 702-442-7095

TACSIS LAW APC
*Pro Hac Vice*
John S. Manzano, Esq. (CA SBN: 170546)
law@tacsis.com
3424 W. Carson Street, Suite 600
Torrance, CA 90503
T/F: 424-234-5200

*Attorneys for Plaintiffs*
TACSIS APC and KENT LIMSON

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TACSIS APC, a California corporation; and KENT LIMSON, an individual, | Case No:   2:24-cv-02284-RFB-EJY |
| Plaintiffs | **FIRST AMEDNED COMPLAINT FOR:** |
| v. | 1. **INJUNCTIVE AND OTHER RELIEF FOR RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (18 U.S.C. §§ 1961, et. seq.)** |
| JACKIE ROBINSON, an individual; ALL NET LAND DEVELOPMENT, LLC, a Nevada Limited Liability Company; ALL NET, LLC, a Nevada Limited Liability Company; DRIBBLE DUNK, LLC, a Nevada Limited Liability Company; AGS ASSURETY, LLC, a Nevada Limited Liability Company; TIMOTHY J. ARELLANO, an individual; DAVID LOWDEN, an individual; MESSNER REEVES LLP, a Colorado Limited Liability Partnership; TORBEN WELCH, an individual; LORING JACOBS, an individual, and DOES 1 THROUGH 100 INCLUSIVE, | 2. **INJUNCTIVE AND OTHER RELIEF FOR RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (Nev. Rev. Stat. §§ 207.350, et seq.)**  <br><br>**DEMAND FOR JURY TRIAL** |
| Defendants. | |

COMES NOW Plaintiffs, TACSIS APC, a California Corporation and KENT LIMSON, an individual (collectively hereinafter, "PLAINTIFFS"), by and through their counsel, SHAWN R. PEREZ, ESQUIRE, Nevada Licensed Counsel, and JOHN S. MANZANO, ESQUIRE (Pro Hac Vice) of TACSIS LAW APC, and bring claims against the Defendants, JACKIE ROBINSON, an individual (hereinafter, "ROBINSON"); ALL NET LAND DEVELOPMENT, LLC, a Nevada Limited Liability Company (hereinafter, "ANLD"); ALL NET, LLC, a Nevada Limited Liability Company (hereinafter, "AN"); DRIBBLE DUNK, LLC, a Nevada Limited Liability Company (hereinafter, "DD"); AGS ASSURETY, LLC, a Nevada Limited Liability Company (hereinafter, "AGS"); TIMOTHY J. ARELLANO, an individual (hereinafter, "ARELLANO"); DAVID LOWDEN, an individual (hereinafter, "LOWDEN"); MESSNER REEVES LLP, a Colorado Limited Liability Partnership (hereinafter, "MRLLP"); TORBEN WELCH, an individual, (hereinafter, "WELCH"); LORING JACOBS, an individual (hereinafter, "JACOBS"); and DOES 1 THROUGH 100 INCLUSIVE.

**THE PARTIES**

1.      Plaintiff TACSIS APC (hereinafter, "TACSIS"), previously known as TACSIS LLC, is a California corporation with its principal place of business in Torrance, California.

2.      Plaintiff KENT LIMSON (hereinafter, "LIMSON") is an individual who resides in the County of Los Angeles, State of California and is a citizen of the State of California.

3.      Plaintiffs are informed and believe and thereon allege that JACKIE ROBINSON ("ROBINSON") is an individual who resides in the County of Clark, State of Nevada and is a citizen of the State of Nevada.

4.      Plaintiffs are informed and believe and thereon allege that ALL NET LAND DEVELOPMENT, LLC ("ANLD") is a Nevada Limited Liability Company with its principal place of business in Las Vegas, Nevada.

5.      Plaintiffs are informed and believe and thereon allege that ALL NET, LLC ("AN") is a Nevada Limited Liability Company with its principal place of business in Las Vegas, Nevada.

6.      ANLD and AN are collectively referred to hereinafter as "ALL NET."

7.    Plaintiffs are informed and believe and thereon allege that DRIBBLE DUNK, LLC ("DD") is a Nevada Limited Liability Company with its principal place of business in Las Vegas, Nevada.

8.    Plaintiffs are informed and believe and thereon allege that AGS ASSURETY, LLC ("AGS") is a Nevada Limited Liability Company with its principal place of business in Las Vegas, Nevada.

9.    Plaintiffs are informed and believe and thereon allege that TIMOTHY J. ARELLANO ("ARELLANO") is an individual who resides in the County of Clark, State of Nevada and is a citizen of the State of Nevada.

10.    Plaintiffs are informed and believe and thereon allege that DAVID LOWDEN ("LOWDEN") is an individual who resides in the County of Clark, State of Nevada and is a citizen of the State of Nevada.

11.    Plaintiffs are informed and believe and thereon allege that MESSNER REEVES LLP ("MRLLP") is a Colorado Limited Liability Partnership with its principal place of business in Denver, Colorado.

12.    Plaintiffs are informed and believe and thereon allege that TORBEN WELCH ("WELCH") is an individual who resides in the State of Utah and is a citizen of the State of Utah.

13.    Plaintiffs are informed and believe and thereon allege that LORING JACOBS ("JACOBS") is an individual who resides in the State of Nevada and is a citizen of the State of Nevada.

14.    The true names and capacities, whether individual, corporate, associate, or otherwise of defendants designated as DOES 1 through 100, inclusive, are presently unknown to Plaintiffs, who therefore sue said defendants by such fictitious names. Plaintiffs will seek leave of this Court to amend this Complaint to show the true names and capacities of said defendants when the same become known, or according to proof at trial. Plaintiffs are informed and believe, and thereon allege, that each of the defendants designated herein as a DOES 1 through 100 engaged in the same conduct as the other defendants, and is responsible in some manner for the events and happenings herein referred to, and that their actions and/or negligence proximately

caused the injuries and damages sustained by Plaintiffs as herein alleged, either through said defendants' own conduct or through the conduct of their agents, servants or employees, or due to their ownership, control, rental, use, sale, maintenance, repair, construction, or lease of any instrumentality by which Plaintiffs' injuries were caused, or in some other manner.

15.    Plaintiffs are informed and believe and thereon allege that each of the Defendants, including DOES 1 through 100, is the agent of the other, and that each of their acts was authorized, ratified, and approved by the other.

16.    All defendants, including DOES 1 through 100, are hereinafter collectively referred to as "DEFENDANTS."

## JURISDICTION AND VENUE

17.    This is an action against Defendants for damages and injunctive relief pursuant to the Racketeer Influenced and Corrupt Organization (hereinafter, "RICO") statutes at 18 U.S.C. §§ 1961-1964, et. seq.

18.    The Court has jurisdiction pursuant to 28 U.S.C. § 1331 as the claims involve questions of federal law as well as jurisdiction over RICO claims pursuant to 18 U.S.C. § 1964.

19.    The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

20.    Venue is appropriate in the District of Nevada pursuant to 28 U.S.C. § 1391(b) in that, a substantial part of the events giving rise to the claims herein occurred in this district and DEFENDANTS are subject to personal jurisdiction in this district as of the commencement of this action. Venue in this district is proper as to PLAINTIFF's claims under the Racketeer Influenced and Corrupt Organizations Act pursuant to 18 U.S.C. § 1965(a).

## FACTUAL BACKGROUND

## THE ORIGINAL SCHEME – SHORT TERM "BRIDGING" LOANS

21.    This case concerns a lending opportunity built on fraud and a Ponzi scheme stemming over ten years, targeting whoever would fall for the scheme and provide loan funding for an alleged lucrative project which was to be built on the Las Vegas strip called the All Net Resort and Arena (hereinafter, the "ALL NET PROJECT") in Las Vegas, Nevada.

22.    The ALL NET PROJECT was described as a prospective elaborate basketball arena and family resort which was to be built on the real property generally located on Las Vegas Boulevard South and Paradise Road, 900 feet south of Sahara Avenue (hereinafter, the "PROPERTY"), otherwise known as a portion of the famous Las Vegas Strip.

23.    At the center of this fraudulent scheme is ROBINSON, who lured individuals into loaning funds to his entity for the project with the promise of high interest, quick repayment and foolproof lending. The scheme ran like this:

a.    The funds were initially loaned to AN, and were to be personally guaranteed by ROBINSON, individually and concurrently backed by "performance bonds" issued by AGS and by ARELLANO as an individual surety. AGS was held out to be a bonding company claiming to have over $600,000,000 in liquid asset funds under bank deposit with only nominal claims outstanding. ARELLANO was alleged to have been securely insured with general liability and excessive errors and omissions insurance coverage. Foolproof indeed.

b.    Immediately after receipt of the funds in AN's account, most, if not all, the funds were transferred into DD's account, an account controlled by ROBINSON.

c.    ROBINSON would then pay out portions of the funds to ARELLANO, who never secured a single bond via himself nor AGS; pay out large sums of money to ANLD for the rental and/or rights to purchase the PROPERTY; pay funds to WELCH for his services, pay out monies to ROBINSON and ROBINSON's spouse; and pay out monies to ROBINSON's various friends and family as "consultants," providing them lush "consultant fees," as well as generous Thanksgiving, Christmas and other bonuses, all the while knowing that the ALL NET PROJECT itself was facing a huge multi-million dollar deficit and was ready to collapse any day as it had no serious commitment building loans needed to properly fund the project.

24.    Between the dates of August, 2014 and through December, 2019, ROBINSON, through the assistance of the other DEFENDANTS identified herein, had received no less than $800,000,000 in "short term" loans which were never paid as promised. Such loans were obtained on the basis of the same material misrepresentations to encourage and solicit the loans, usually, the story being a great return on investment, quick returns on the money and fool proof repayment

backed by multiple bond sureties. On no less than four known occasions, ROBINSON even provided written equity percentage ownership agreements in the overall ALL NET PROJECT to get the loans ROBINSON wanted, including one to LIMSON.

25.     In 2018, ARELLANO contacted LIMSON to fundraise for ROBINSON. To that end, ARELLANO inquired whether LIMSON was interested in providing some short-term loans to the ALL NET PROJECT. ARELLANO targeted LIMSON, a CPA in Los Angeles, to exploit LIMSON's access to wealthy individuals who were always looking for good return on investment opportunities. ARELLANO explained to LIMSON that due to the delay in receiving billions of dollars in previously approved building funds, which was to happen any day, that smaller short-term "bridging loans" were needed in the interim to keep the ALL NET PROJECT afloat until the main funding arrived.

26.     ARELLANO next introduced LIMSON to ROBINSON to further discuss the ALL NET PROJECT and its desire to obtain interim funding via these short-term "bridging loans." Following such introduction and dialogue, PLAINTIFFS performed investigation and due diligence and during the course of such due diligence, PLAINITIFF was provided proof of signed multi-billion dollar building loan agreements for building funds, various Certificates of Insurance reflecting ARELLANO and AGS's general liability and excess errors and omissions policy coverages, and written assurance by way of a trust account administrator who provided verification of the amount and location of such funds that AGS was financially stable and able to pay any claims to cover the needs of PLAINITFF's loans if there was a default on the loans.

27.     PLAINTIFFS were informed that several of ROBINSON's entities—such as All Net, LLC; All Net Development, LLC; and All Net Land Development, LLC—were set up for various "holdings" in the overall  ALL NET PROJECT and in anticipation of the finalized ALL NET PROJECT, and that AN, would be the parent company which would ultimately "own" and manage the project. ANLD, owned by the LOWDEN family, would be the owners of the project, holding the main luxury owner's box, front and center in the arena.

28.     PLAINTIFFS were informed that while each of the various ALL NET entities were participants in the ALL NET PROJECT, the loans were to be wired to the main AN account

1  and that the contracts would be written up with AN as the parent entity for the ALL NET

2  PROJECT. It was further disclosed that while an "old" entity existed, one ROBINSON had set up

3  many years prior for his past projects, DD, this entity was not to become a part of the ALL NET

4  PROJECT as everything else had been set up in the various ALL NET entity name structure, yet

5  it was ultimately where most of the funds were funneled for distribution by ROBINSON.

6        29.    As a part of his further due diligence efforts and as time progressed, PLAINTIFFS

7  would periodically inquire of the use of the funds and the names of the parties involved in the

8  ALL NET PROJECT, including the architect, the construction heads and the other lenders in the

9  ALL NET PROJECT. PLAINTIFFS visited the PROPERTY several times and personally met

10  with ROBINSON at the on-site construction trailer. Everything presented to PLAINTIFFS gave

11  the appearance of legitimacy of the project.

12        30.    At one point during the transaction, as a further assurance of the safe investment of

13  the loans, LIMSON was included in a three-way telephone call with David Lowden, President

14  and Managing Member of ANLD, whose family owned the PROPERTY under their entity,

15  ANLD. About a year prior to LIMSON's involvement, the Lowden family had transferred the

16  land from the name, SAHARA LAS VEGAS CORP, (hereinafter, "SAHARA"),  to ALL NET

17  LAND DEVELOPMENT, as a newly formed, cohesive named entity to match the ALL NET

18  scheme. During that call, LIMSON was informed by DAVID LOWDEN that the Lowden family,

19  as owners of the ALL NET PROJECT site location, were also invested in the ALL NET

20  PROJECT, and everything was good to go and was moving forward smoothly, and that they

21  would hold the main "owner's box" once the stadium was built, giving the appearance to

22  LIMSON that the LOWDENS were, in fact, a part of the entity structure.

23        31.    As further enticement and assurance of the loan payback, PLAINTIFFS were

24  provided a series of documents which included verification of the liquidity of the AGS bonds

25  which held over $600,000,000 in available bank reserves, including some minor outstanding

26  claims.

27  ///

28  ///

32.    PLAINTIFFS received performance bonds as security for the loans, which PLAINTIFFS would later learn through discovery were fraudulent forgeries. Not a single bond was ever issued.

33.    PLAINTIFFS received from AGS and ARELLANO a notarized trust receipt verifying funds in the sum of $627,500.00 which was readily available in a local bank in the event any claims were submitted against the bonds purchased to protect the loans noted herein. Over time, and as a further inducement to obtain additional funds from PLAINTIFFS, ROBINSON would make small and inconsistent payments towards the existing LOANS and even went so far as to enter into extension agreements and a Memorandum of Understanding as a showing of good faith that ROBINSON and AN intended to pay the balances due under the LOANS with full interest once the building fund loans were received although neither ROBINSON nor any of the DEFENDANTS ever intended to repay the LOANS. These acts were nothing more than means to an end in DEFENDANTS' elaborate Ponzi scheme.

34.    PLAINTIFFS ultimately provided a series of seven (7) loans (collectively, the "LOANS") to the ALL NET PROJECT. The terms of the loans were embodied in seven similar written contract agreements which contained specific use terms and rights to UCC-1 assurances. These loans totaled $2,144,200.00 and were made over the course of six months in late 2018 through early 2019. As part and parcel to the fifth loan, and as a further incentive to delay repayment on the previous four smaller loans, which had already entered the default stage, LIMSON was given 1/10[th] of 1% overall equitable ownership in the ALL NET PROJECT in perpetuity, which was presented as being worth potentially millions of dollars in the future as the popularity of the stadium grew, as well as a written employment contract which would become effective once the ALL NET PROJECT became operational.

35.    Theretofore and thereafter, PLAINTIFFS sought to recover payment for the LOANS via the related performance bonds. Yet over the course of several months, PLAINTIFFS' efforts were stonewalled by various persons, including but not limited to ROBINSON, ARELLANO, AGS, and attorney ALISA J. STEINHAUER, who made repeated representations

that it was represented and confirmed that the bonds were issued and insured, that the bond claims were being investigated.

36.    In order to avoid court action, DEFENDANTS requested a further opportunity to provide payment to PLAINTIFFS under the LOANS. To that end, on or about December 11, 2019, ANDREW MASON, claiming to be the Trustee of the AGS Assurety Investment Trust, executed a notarized affidavit asserting that AGS "has on its books of cash/cash equivalent assets with a value of *Six Hundred and Forty-Three Million Dollars 00/100 US Dollars ($643,000,000),* which shall be held and allocated for Individual Surety Bonds written against the trust of which *Seventy-Eight Million Seven Hundred and Fifty Thousand Dollars and 00/100 US Dollars ($78,750,000)* in outstanding bond liability is currently written against the trust."

37.    In or about March 2020, PLAINTIFFS submitted claims against the insurance policies identified in the Certificates of Insurance that ARELLANO and AGS provided in connection with DEFENDANTS' representations that the performance bonds were insured by Admiral Indemnity Insurance Company, Twin City Fire Insurance Company, and Arch Specialty Insurance Company. Said Certificates of Insurance were provided concurrently with letters purporting to represent and confirm that the performance bonds had been issued. Only one of the insurance companies—Twin City Fire Insurance Company—responded to PLAINTIFFS claim, and denied coverage in or about April 2020.

**INCEPTION OF LITIGATION**

38.    Following DEFENDANTS' breach of the LOANS and surety agreements, and failed agreements to pay and further stall the inevitable, PLAINTIFFS initiated their lawsuit in the Los Angeles County Superior Court, case number 20STCV41938 (hereinafter, the "CALIFORNIA ACTION").

39.    After conducting discovery in the CALIFORNIA ACTION, it became evident that it was something much more than simply defaulted loans; it was clearly fraud and a Ponzi scheme. More specifically:

    a.    It was discovered that the LOANS were never used for the ALL NET PROJECT, and were instead used as payouts to ROBINSON, ARELLANO, and all of

ROBINSON's various "consultants" on the project, including a $60,000.00 check earmarked as a Christmas bonus to ROBINSON himself, a bonus to his spouse, and bonuses to each of ROBINSON's "consultants."

b.      It was discovered that the amounts paid to the consultants were commensurate with the value of the loan received. ARELLANO received huge "premium" payoffs; monies never used to secure the bonds as promised.

c.      It was discovered that JACOBS was a doctor and would encourage and solicit loans from his doctor friends/associates for ROBINSON, and for each loan received, JACOBS would receive a bonus or commission.

d.      It was discovered that not one 1099 tax payment form, for over ten years of payments in the millions to these "consultants," was ever issued on the funds which were paid to all these persons.

e.      It was discovered that the surety bonds, which were to be guaranteed by AGS and ARELLANO were fraudulent and/or forged, despite AGS and ARELLANO having collected premiums that were paid for at the time each of the LOANS funded.

f.      It was discovered that both of the errors and omissions insurance proof coverage were false and that the general liability policy only covered a small chocolate shop in Utah which ARELLANO ran on the side.

g.      It was discovered that ARELLANO received huge "premium" payoffs and that monies given to him and to AGS were never used to secure the bonds as promised.

h.      It was discovered that the notarized verification of available bond funds signed by Andrew Mason was a forgery as Andrew Mason was non-existent (like many of the other construction loan signatories for which ROBINSON had provided false loan documents supporting the any day funding loans.)

i.      It was discovered that ANLD assisted and participated in the preparation and filing of a Memorandum of Lease and Option to Purchase, reflecting that ROBINSON had certain land use and purchase rights, when at various times he did not and, in fact, was in serious

delinquencies most of the time during his occupancy on the land, giving any potential lender the false sense of viable land rights for use by the project;

          j.    It was discovered that the land use permits were all in the name of ANLD, as evidenced by various filings with the Clark County Commission for the land use permits which were signed by LOWDEN and notarized, along with the land use attorney's letter clearly stating that they represented ANLD while standing before the Clark County Commission seeking extensions to continue "their" (i.e., ANLD's) project. Contrary to these representations to the Clark County Commission, LOWDEN now contends that putting the land use permits in ANLD's name were "in error."

          k.    It was discovered that in a similar series of transactions, DEFENDANTS utilized the same short-term loan and equity scheme to secure multiple loans for the ALL NET PROJECT. The facts surrounding this series of transactions are described in the Complaint filed by CANCER CARE FOUNDATION, INC., a Nevada Non-Profit Corporation against DD, AN, and others in the Clark County District Court, case number A-24-886923-C. These acts involve the same scheme and methods involved in the subject enterprise.

          l.    It was discovered that in a similar series of transactions, DEFENDANTS utilized the same short-term loan and equity scheme to secure multiple loans for the ALL NET PROJECT. The facts surrounding this series of transactions are described in the Complaint filed by MMV INVESTMENTS LLC, a Delaware limited liability company against DD, AN, ROBINSON, and others in the Clark County District Court, case number A-21-844680-B. These acts involve the same scheme and methods involved in the subject enterprise.

          m.    It was discovered that in a similar series of transactions, DEFENDANTS utilized the same short-term loan and equity scheme to secure multiple loans for the ALL NET PROJECT. The facts surrounding this series of transactions are described in the Complaint filed by NEXT STEP VENTURE LTD., an Anguilla International Business Corporation against DD, AN, and others in the Clark County District Court, case number A-24-886942-C. These acts involve the same scheme and methods involved in the subject enterprise, all orchestrated by WELCH in setting up the fake banks which were to provide such funding.

40.     Prior to conducting discovery in the CALIFORNIA ACTION, it was unbeknownst to PLAINTIFFS that ANLD's now alleged true purpose was only to facilitate the sale of the PROPERTY through the transfer of membership shares for a financial savings between the landlord (i.e., ANLD) and the tenant (i.e., DD), and that the LOWDEN's were the landlord of the PROPERTY rather than owner/partners in the ALL NET PROJECT, as presented.

41.     ANLD's true purpose is completely contradictory to what was previously represented to PLAINTIFFS—i.e., that the various ALL NET entities were set up in anticipation for certain aspects of the ALL NET PROJECT. In fact, although ALL NET, LLC and ALL NET DEVELOPMENT, INC. were actually set up in the earlier phase of the project, ANLD had only formed less than a year prior to PLAINITFF'S LOANS, and the ownership title itself had been transferred and recorded from SAHARA LAS VEGAS CORP to ANLD, all in an effort to mislead and confuse any potential lender to misunderstand the true relationship between the parties.

42.     For ANLD and himself, LOWDEN claims to have no involvement in the fraudulent activities of the other DEFENDANTS and that ANLD was merely the landlord of the PROPERTY. Yet, it was LOWDEN himself who personally prepared the various leases and amendments thereto, giving the false illusion that ROBINSON was in good standing on the lease (when he was not), and that ROBINSON had the purchase and building entitlement rights to the PROPERTY (when he did not); that ROBINSON was in "good standing" on his option to purchase with the LOWDENS, when in fact he was not, and that the LOWDENS would charge ROBINSON large "fees of reinstatement" in order to falsely mislead potential lenders that ROBINSON'S financial position was stable, when instead, the only "right" that ROBINSON held in relation to the PROPERTY was the right to do some initial grading per the Clark County Commission. Anything beyond that would require ROBINSON to seek further approval from the Commission to move forward with the ALL NET PROJECT, which it could not, due to the continued lack of building funds.

43.     Further, it was ANLD and LOWDEN who would benefit from all the monies which were actually placed in the ALL NET PROJECT as the entitlements to the PROPERTY

followed the PROPERTY itself once ROBINSON was removed due to ROBINSON's inability to pay further rent and/or land purchase rights from ANLD.

44.    LOWDEN's actions on behalf of ANLD were certainly as an agent, an ostensible agent, and/or an apparent agent of the various All Net entities involved and/or purportedly involved in the ALL NET PROJECT, whether intentional or grossly negligent, to give the appearance that ANLD was a partner of the ALL NET team involved in the ALL NET PROJECT in light of all the circumstances and involvement performed by LOWDEN.

45.    Both before and after the inception of the CALIFORNIA ACTION, DEFENDANTS sought to convince PLAINTIFFS that the ALL NET PROJECT was legitimate, that the performance bonds were legitimate, that funding was imminent, and that the full balance due to PLAINTIFFS was to be paid. By way of example and not of limitation:

    a.    In or about November, 2018, ROBINSON, ARELLANO, and AGS provided documentation through Attorney Michael G. Byers to PLAINTIFFS, stating that AGS and ARELLANO were, *inter alia*, "ready, willing and able to provide financial guarantee for surety bonds" and that "AGS has current outstanding liabilities of $3,268,074.22, with a total of $650,000,000 of available assets."

    b.    In or about October, 2019, ARELLANO and AGS provided correspondence that, *inter alia*, stated that they were investigating the claims against the performance bonds and would respond within 45 business days.

    c.    In or about November, 2019, Attorney Alisa J. Steinhauer provided correspondence on ARELLANO's and AGS's letterhead that, *inter alia*, asserted a 45 business day period to investigate claims made against the performance bonds and various documents needed to conduct the investigation.

    d.    In or about December, 2019, ANDREW MASON, claiming to be the Trustee of the AGS Assurety Investment Trust, executed a notarized affidavit asserting that AGS "has on its books of cash/cash equivalent assets with a value of *Six Hundred and Forty-Three Million Dollars 00/100 US Dollars ($643,000,000),* which shall be held and allocated for Individual Surety Bonds written against the trust of which *Seventy-Eight Million Seven Hundred*

*and Fifty Thousand Dollars and 00/100 US Dollars ($78,750,000)* in outstanding bond liability is currently written against the trust."

      e.     In our about January, 2020, ROBINSON and ARELLANO, through Attorney Alisa J. Steinhauer, represented that ROBINSON and ARELLANO would produce documents that included both evidence that funding for the ALL NET PROJECT had been secured and that ARELLANO and AGS possessed sufficient liquidity to satisfy the performance bond.

      f.     In or about February, 2020, Attorney Alisa J. Steinhauer represented on behalf of ROBINSON and ARELLANO that the bond was collectible and was insurance for payment.

      g.     In or about December, 2021, ARELLANO and AGS published multiple documents on their website, including:

          i.     A "company profile" touting ARELLANO's 35 years of experience as an individual surety for various projects, including the ALL NET PROJECT, rendering himself an "industry leader" with a reputation for "professionalism and integrity."

          ii.     A "letter of third party certification" by Attorney Charles Dominick Lombino purporting to have verified that ARELLANO and AGS had the more than $600,000,000 in assets to support the individual surety bonds issued by ARELLANO and AGS.

          iii.     A "Certificate of Liability Insurance" purporting to show that National Liability & Fire Insurance Company, Twin City Fire Insurance Company, and Arch Specialty Insurance Company insured ARELLANO and AGS.

          iv.     A letter from WELCH on MRLLP's letterhead stating that ARELLANO has substantially complied with Federal and Utah law for issuance of a personal surety bond and that ARELLANO was exempt from licensing or registration requirements as a result to

give the allure that AGS and/or ARELLANO stood financially

capable to pay any bonds claims in the event of a default.

h.      In or about January, 2022, MRLLP and WELCH provided PLAINTIFFS

with documentation allegedly evidencing a non-traditional funding arrangement for the ALL NET

PROJECT, which was in place and would be used to pay the full balance due to PLAINTIFFS,

plus interest.

i.      In or about June, 2022, AN and ROBINSON represented that the full

amount due to PLAINTIFFS, plus interest, would be paid.

j.      In or about August, 2022, MRLLP represented to PLAINTIFFS that

WELCH was handling the financing of the ALL NET PROJECT, and in fact, was the attorney of

records for ROBINSON, ANLD, ARELLANO AND AGS through the initial stages of litigation

in the state action wherein they continued their farse of paying the loans back in order to dodge

having to respond to discovery and/or appear at depositions .

k.      Between 2021 and 2024, engaging in various acts to delay legitimate

discovery culminating in the necessity for a discovery referee, including but not limited to failing

to respond to discovery, failing to adhere to court orders to respond to discovery, failing to

produce documents for deposition, refusing to appear at depositions, and generally stonewalling

legitimate discovery causing the court to have to appoint a discovery referee due to the refusal to

comply to discovery obligations by the Defendant parties .

l.      For years, representing at public hearings through a plethora of attorneys,

bankers, and others that funding for the ALL NET PROJECT was imminent and that construction

would proceed as advertised.

The collective aim and intent of these tactics are clear—DEFENDANTS sought to

conceal the true nature of the ALL NET PROJECT, and to prevent PLAINTIFFS from

discovering the truth so the DEFENDANTS could  continue their fraudulent enterprise.

## EVOLUTION OF THE SCHEME

46.  For some time, following receipt of PLAINTIFF's LOANS, DEFENDANTS

continued their Ponzi scheme in borrowing funds from unsuspecting lenders under similar terms

as PLAINTIFFS. Eventually, DEFENDANTS were unable to find any new lenders and moved to the next stage of their funding scheme.

47.  The next stage of DEFENDANTS' funding scheme; siphoning client funds from MRLLP's client trust account under the guise of "investing" the siphoned funds -- of course, without the consent of the clients whose funds were being siphoned. When this did not work, since he had been caught, WELCH then resorted to a secondary enterprise where he set up various entities between himself and ROBINSON, including but not limited to, SAFFOLD MCNEIL, INC. and NOBODY CARES JVE, LLC to give himself a substantial ownership interest in the ALL NET PROJECT, and if successful, would make himself a billionaire.

48.  To facilitate this secondary enterprise, WELCH associated with several known and convicted felons for the purpose of creating fake lending entities that, in turn, would then market Business Equity Lines of Credit (hereinafter, "BELOC") to businesses to obtain their commission deposit funds to then place them into funding the financially out of control ALL NET PROJECT [See *BKNS v. Messner Reeves LLP* (Utah District Court Case No. 1:24-cv-05581); *Konala v. Messner Reeves LLP* (Utah District Court Case No. 2:24-cv-00195); *Kosher Eats v. Messner Reeves LLP* (California District Court Case No. 2:24-cv-05161); and *Emerald Consulting Partners LLC v. Messner Reeves LLP* ( Orange County Superior Court Case 30-2024-01378580)].  These lending entities would entice businesses seeking BELOC loans; take on huge deposits for the fees on the loans; then default the customer in some manner, a technicality to keep the deposits and never actually fund the BELOC. In effect, the BELOC scheme was an elaborate evolution of how DEFENDANTS defrauded PLAINTIFFS by making promises that DEFENDANTS never intended to keep, simply to line their own pockets. Put another way, this is nothing more than a blatant cash grab by DEFENDANTS. In fact, the "banks" which were to fund these loans were set up by WELCH in various locations throughout the United States. The fraudulent banks included, but were not limited to, FIDES Bank, Clearwater Perpetual Premiere Bank, McMahon Capital, INBE Capital, DPG Investments, Titan Financial and Latham Capital, to name a few. Each of these lenders were really LLCs, set up using a Ponzi person who would

pose as "the banker" with significant assets, and would file some documents to make the entity look legitimate

49.  Ultimately, the ALL NET PROJECT ran out of time for its construction deadlines, which, due to its lack of being able to prove adequate and legitimate funding, crumbled as it was nothing more than a house of cards with little to show for the monies invested. In November 2023, the Clark County Commission shut down the project as they too, were tired of hearing about the billions in funding which was to fund "any day," yet had never funded since 2017, when ROBINSON first announced the project was initially funded with a $4,000,000,000 loan from Qatar, signed by an alleged Saudi prince by the name of Abdul El-Basir, who never existed.

50.  In the end, ANLD never sold the PROPERTY to ROBINSON or any of the other DEFENDANTS, despite the numerous promises to the contrary, and the only construction "work" that ROBINSON ever did to bring the ALL NET PROJECT to fruition was some initial grading and excavation of the lot, which resulted in an eyesore on the strip as it was only a hole in the dirt, which would flood and attract mosquitos when it rained. In fact, ANLD has since taken advantage of the property entitlements to try to rebuild the stadium project with other investors.

51.  Instead, DEFENDANTS used most (if not all) of the LOAN funds to line their pockets and live lavish lifestyles with funds that had been fraudulently acquired under the guise of keeping the ALL NET PROJECT alive, with no intent of ever repaying the LOANS, while waiting for building financing that DEFENDANTS knew would never arrive, while continuing to represent that the funding would arrive shortly and that everything was good to go.

52.  As a result, DEFENDANTS victimized PLAINTIFFS (and others) to the tune of millions of dollars over the approximately ten years that passed since the ALL NET PROJECT broke ground, until it was ultimately shut down by the Clark County Commission.

53.  When the Clark County Commission shut down the ALL NET PROJECT in November, 2023, via a motion to deny made by Commissioner Richard Segerblom, Commissioner Segerblom stated that his motion to deny was based on the fact that "time and time again, [DEFENDANTS] asked just one more year, two years. Let's get this done. We'll get it

done. [The Clark County Commission] followed the money everywhere around the world, and truthfully, it hasn't happened."

54.   As a direct and proximate result of DEFENDANTS' repeated failures to move the ALL NET PROJECT forward as repeatedly represented to and required by the Clark County Commission, LIMSON not only lost his 1/10th of 1% overall equitable ownership in the ALL NET PROJECT in perpetuity, which was presented as being worth potentially millions of dollars in the future as the popularity of the stadium grew, but also the sum of $150,100.00 in consideration that LIMSON provided to DEFENDANTS for the equitable ownership interest.

## COUNT ONE

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT

## 18 USC § 1962

### (As Against All Defendants)

55.   PLAINTIFFS incorporate paragraphs 1 through 54 of this Complaint, as if fully set forth herein.

56.   18 U.S.C. § 1962(c) provides that, "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

57.   A civil RICO claim must plausibly allege that the defendants: (1) operated or managed, (2) an enterprise, (3) through a pattern, (4) of racketeering activity that included at least two predicate acts of racketeering, (5) which resulted in and/or caused, (6) injury to the business or property of the plaintiff.

58.   For RICO purposes, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

59.   DEFENDANTS constitute an "enterprise" as defined by 18 U.S.C. § 1961(4) because DEFENDANTS, and each of them, directly and/or indirectly participated in the conduct the enterprise's affairs; more specifically, DEFENDANTS, and each of them, participated in the

racketeering activities perpetuated by the enterprise to fraudulently induce PLAINTIFFS to provide money to the ALL NET PROJECT under the guise of keeping the ALL NET PROJECT alive, with no intent of ever repaying the LOANS, while waiting for primary financing that DEFENDANTS knew would never arrive, while continuing to represent that the funding would arrive shortly and that everything was good to go, and are therefore liable to PLAINTIFFS pursuant to 18 U.S.C. § 1962.

60.    DEFENDANTS further associated for the fraudulent purpose of obtaining money from PLAINTIFFS for the purpose of financing their lavish lifestyles such that as soon as AN received money from PLAINTIFFS, most, if not all of the funds, were transferred into DD's bank account, an account controlled solely by ROBINSON, and in turn, ROBINSON would then pay out commissions to ARELLANO, who never secured any bonds via himself nor AGS; pay out large sums of money to ANLD for the rental and/or rights to purchase the PROPERTY; pay out monies to ROBINSON and ROBINSON's spouse; and pay out monies to ROBINSON's various friends and family "consultants," providing them lush salaries and generous Thanksgiving, Christmas and other bonuses, all while knowing that the ALL NET PROJECT itself was facing a huge multi-million dollar deficit and was ready to collapse any day.

61.    For RICO purposes, a "pattern" requires "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). DEFENDANTS carried out seven acts of wire fraud in connection with the LOANS:

| Loan No. | Date of Wire | Amount of Loan | Payee | Depository Bank |
|---|---|---|---|---|
| 1 | 11/13/18 | $565,000.00 | All Net LLC | Wells Fargo Bank, N.A. |
| 2 | 11/30/18 | $1,079,200.00 | All Net LLC | Wells Fargo Bank, N.A. |
| 3 | 02/11/19 & 02/13/19 | $100,000.00 | All Net LLC | Wells Fargo Bank, N.A. |
| 4 | 02/15/19 | $150,000.00 | All Net LLC | Wells Fargo Bank, N.A. |
| 5 | 05/01/19 | $100,000.00 | All Net LLC | Wells Fargo Bank, N.A. |

| 6 | 07/05/19 | $100,000.00 | All Net LLC | Wells Fargo Bank, N.A. |
| 7 | 07/12/19 | $50,000.00 | All Net LLC | Wells Fargo Bank, N.A. |
| **TOTAL** | | **$2,144,200.00** | | |

In addition, DEFENDANTS committed additional separate acts of wire fraud by both (1) charging and accepting the sum of $119,492.50 for performance bonds that were neither issued nor insured, despite representing to PLAINTIFFS that the bonds were in fact issued, guaranteed in the event of a default by the borrower, and insured and (2) charging and accepting the sum of $150,100.00 from PLAINTIFFS in exchange for 1/10th of 1% overall equitable ownership in the ALL NET PROJECT in perpetuity, despite DEFENDANTS

62.     The multiple acts of wire fraud by DEFENDANTS over a period of several months reflect a clear and unmistakable pattern, as the various acts of wire fraud were related and demonstrate conduct of a continuing nature.

63.     Closed-ended continuity—which applies where the predicate acts appear to have stopped but at one time continued for a sufficient amount of time—is established as DEFENDANTS engaged in a series of related unlawful acts over a significant period of time lasting many months, including, but not limited to, multiple acts of wire fraud as well as intentionally misrepresenting DEFENDANTS' intent to pay the LOANS as a means to obtain additional funding from PLAINTIFFS.

64.     Open-ended continuity—which applies where the predicate acts have every indication of continuing into the future—is established because DEFENDANTS' various racketeering acts themselves include a specific threat of repetition, extending indefinitely into the future and the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Without judicial intervention to terminate DEFENDANTS' unlawful conduct, DEFENDANTS' unlawful conduct could continue unabated into the future indefinitely.

65.     DEFENDANTS have worked together continuously for more than a decade, and their modus operandi is fraud. DEFENDANTS created an elaborate and evolving Ponzi scheme to create the feel-good image of building a family-centric oasis in Las Vegas where everyone

could enjoy the resort hotel, retail and restaurant space, free from gambling, and a multi-purpose arena that would house an NBA expansion team.

66.     As it turned out, nothing could be further from the truth and DEFENDANTS directly engaged in an elaborate and evolving Ponzi scheme to obstruct the uncovering of the truth.

67.     In a manner affecting interstate commerce, DEFENDANTS secured LOAN funds from PLAINTIFFS and others through wire transfers.

68.     DEFENDANTS and each of them participated as principals to further the fraudulent ALL NET PROJECT with the income derived from the multiple and continuous acts of racketeering against PLAINTIFFS such that DEFENDANTS are liable to PLAINTIFFS pursuant to 18 U.S.C. § 1962(a).

69.     DEFENDANTS also acquired or maintained their interest in, and/or control of, the fraudulent ALL NET PROJECT through their ownership or other material interest and are thereby liable to PLAINTIFFS under 18 U.S.C. § 1962(b).

70.     DEFENDANTS, who were employed by or associated with the fraudulent ALL NET PROJECT, engaged in, conducted or participated, directly or indirectly, in the conduct of the fraudulent ALL NET PROJECT's affairs through a pattern of racketeering activity and are thereby liable to PLAINTIFFS under 18 U.S.C. § 1962(c).

71.     DEFENDANTS conspired to act in furtherance of the fraudulent ALL NET PROJECT to the detriment of PLAINTIFFS and others and are thereby liable to PLAINTIFFS under 18 U.S.C. § 1962(d).

## COUNT TWO

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT

### Nev. Rev. Stat §§ 207.350, et seq.

### (As Against All Defendants)

72.     PLAINTIFFS incorporate paragraphs 1 through 71 of this Complaint, as if fully set forth herein.

73.     Nev. Rev. Stat. § 207.380 defines "Enterprise" to include: (1) any natural person, sole proprietorship, partnership, corporation, business trust or other legal entity; and (2) any union, association or other group of persons associated in fact although not a legal entity.

74.     As described hereinabove, DEFENDANTS constitute an "enterprise" as defined by Nev. Rev. Stat. § 207.380 because DEFENDANTS, and each of them, directly and/or indirectly participated in the conduct the enterprise's affairs. More specifically, DEFENDANTS, and each of them, participated in the racketeering activities perpetuated by the enterprise to fraudulently induce PLAINTIFFS to provide money to the ALL NET PROJECT under the guise of keeping the ALL NET PROJECT alive, with no intent of ever repaying the LOANS, while waiting for primary financing that DEFENDANTS knew would never arrive, while continuing to falsely represent that the funding would arrive shortly and that everything was good to go. DEFENDANTS further associated for the fraudulent purpose of obtaining money from PLAINTIFFS for the purpose of financing their lavish lifestyles such that as soon as AN received money from PLAINTIFFS, most, if not all of the funds, were transferred into DD's bank account, an account controlled solely by ROBINSON, and in turn, ROBINSON would then pay out commissions to ARELLANO, who never secured any bonds via himself nor AGS; pay out large sums of money to ANLD for the rental and/or rights to purchase the PROPERTY; pay out monies to ROBINSON and ROBINSON's spouse; and pay out monies to ROBINSON's various friends and family "consultants," providing them lush salaries and generous Thanksgiving, Christmas and other bonuses, all while knowing that the ALL NET PROJECT itself was facing a huge multi-million dollar deficit and was ready to collapse any day. The subject enterprise's purpose was designed to obtain fraudulent investments in the ALL NET PROJECT and loans to fund the ALL NET PROJECT. The subject enterprise has a distinct structure with ROBINSON serving as the public "face" of the ALL NET PROJECT and handle monies related to the ALL NET PROJECT. Moreover, the subject enterprise has engaged in transactions beyond PLAINTIFFS' LOANS such that the enterprise poses a threat of ongoing criminal activity.

75.     Nev. Rev. Stat. § 207.370 defines a "criminal syndicate" to mean "any combination of persons, so structured that the organization will continue its operation even if

1    individual members enter or leave the organization, which engages in or has the purpose of

2    engaging in racketeering activity."

3        76.    As described hereinabove, DEFENDANTS constitute a "criminal syndicate" as

4    defined by Nev. Rev. Stat. § 207.370 because DEFENDANTS, and each of them, directly and/or

5    indirectly participated in the conduct the enterprise's affairs; more specifically, DEFENDANTS,

6    and each of them, participated in the racketeering activities perpetuated by the enterprise to

7    fraudulently induce PLAINTIFFS to provide money to the ALL NET PROJECT under the guise

8    of keeping the ALL NET PROJECT alive, with no intent of ever repaying the LOANS, while

9    waiting for primary financing that DEFENDANTS knew would never arrive, while continuing to

10    falsely represent that the funding would arrive shortly and that everything was good to go.

11    DEFENDANTS further associated for the fraudulent purpose of obtaining money from

12    PLAINTIFFS for the purpose of financing their lavish lifestyles such that as soon as AN received

13    money from PLAINTIFFS, most, if not all of the funds, were transferred into DD's bank account,

14    an account controlled solely by ROBINSON, and in turn, ROBINSON would then pay out

15    commissions to ARELLANO, who never secured any bonds via himself nor AGS; pay out large

16    sums of money to ANLD for the rental and/or rights to purchase the PROPERTY; pay out monies

17    to ROBINSON and ROBINSON's spouse; and pay out monies to ROBINSON's various friends

18    and family "consultants," providing them lush salaries and generous Thanksgiving, Christmas and

19    other bonuses, all while knowing that the ALL NET PROJECT itself was facing a huge multi-

20    million dollar deficit and was ready to collapse any day. The ALL NET PROJECT itself is

21    structured in such a way that even if individual members enter or leave the organization, the

22    organization's purpose of engaging in racketeering activity will continue as the racketeering

23    activity is perpetuated by the use of fraudulent documents that are intended to create an

24    appearance of legitimacy to the racketeering activity.

25        77.    Nev. Rev. Stat. § 207.390 defines a "racketeering activity" to mean "engaging in at

26    least two crimes related to racketeering that have the same or similar pattern, intents, results,

27    accomplices, victims or methods of commission, or are otherwise interrelated by distinguishing

28    characteristics and are not isolated incidents, if at least one of the incidents occurred after July 1,

1983, and the last of the incidents occurred within 5 years after a prior commission of a crime related to racketeering."

78.     This action arises from DEFENDANTS' operation of a fraudulent investment scheme designed to defraud Plaintiff and others through a pattern of racketeering activity, as defined under Nev. Rev. Stat. § 207.390. These acts are related, share common methods and victims, and demonstrate continuity through repeated fraudulent schemes. Specifically:

  a. DEFENDANTS, through the aforementioned enterprise, solicited from PLAINTIFFS multiple LOANS to fund the fraudulent ALL NET PROJECT, with ROBINSON, ARELLANO, LOWDEN, and others made false and fraudulent representations to PLAINTIFFS, including but not limited to, that the ALL NET PROJECT would provide a great return on investment, that the ALL NET PROJECT would provide quick returns on the money and fool proof repayment backed by multiple bond sureties, that due to the delay in receiving billions of dollars in previously approved building funds—which was to happen any day—that smaller short-term "bridging loans" were needed in the interim to keep the ALL NET PROJECT afloat until the main funding arrived, and others. PLAINTIFFS relied on these representations and provided DEFENDANTS with the LOANS in the principal sum of $2,144,200.00. DEFENDANTS intended to defraud PLAINTIFF, and DEFENDANTS used the LOANS to pay out large sums of money to ANLD for the rental and/or rights to purchase the PROPERTY; pay out monies to ROBINSON and ROBINSON's spouse; and pay out monies to ROBINSON's various friends and family "consultants," providing them lush salaries and generous Thanksgiving, Christmas and other bonuses, all while knowing that the ALL NET PROJECT itself was facing a huge multi-million dollar deficit and was ready to collapse any day.

b. In a related series of transactions, DEFENDANTS utilized the same short-term loan and equity scheme to secure multiple loans for the ALL NET PROJECT. The facts surrounding this series of transactions are described in the Complaint filed by CANCER CARE FOUNDSTION, INC., a Nevada Non-Profit Corporation against DD, AN, and others in the Clark County District Court, case number A-24-886923-C. These acts involve the same scheme and methods involved in the subject enterprise.

c. In a related series of transactions, DEFENDANTS utilized the same short-term loan and equity scheme to secure multiple loans for the ALL NET PROJECT. The facts surrounding this series of transactions are described in the Complaint filed by MMV INVESTMENTS LLC, a Delaware limited liability company against DD, AN, ROBINSON, and others in the Clark County District Court, case number A-21-844680-B. These acts involve the same scheme and methods involved in the subject enterprise.

d. In a related series of transactions, DEFENDANTS utilized the same short-term loan and equity scheme to secure multiple loans for the ALL NET PROJECT. The facts surrounding this series of transactions are described in the Complaint filed by NEXT STEP VENTURE LTD., an Anguilla International Business Corporation against DD, AN, and others in the Clark County District Court, case number A-24-886942-C. These acts involve the same scheme and methods involved in the subject enterprise.

The predicate acts are related by common participants (DEFENDANTS), victims (investors like PLAINTIFFS), methods (short-term loans and equity agreements), and purpose (to obtain funds fraudulently). They amount to an open-ended pattern and pose a threat of continued activity, as the Enterprise continues to solicit new investors.

79. Nev. Rev. Stat. § 207.400 provides that it is unlawful for any person:

(a) Who has with criminal intent received any proceeds derived, directly or indirectly, from racketeering activity to use or invest, whether directly or indirectly, any part of the

proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of:

(1)    Any title to or any right, interest or equity in real property; or

(2)    Any interest in or the establishment or operation of any enterprise.

(b)    Through racketeering activity to acquire or maintain, directly or indirectly, any interest in or control of any enterprise.

(c)    Who is employed by or associated with any enterprise to conduct or participate, directly or indirectly, in:

(1) The affairs of the enterprise through racketeering activity; or

(2) Racketeering activity through the affairs of the enterprise.

(d)    Intentionally to organize, manage, direct, supervise or finance a criminal syndicate.

(e)    Knowingly to incite or induce others to engage in violence or intimidation to promote or further the criminal objectives of the criminal syndicate.

(f)    To furnish advice, assistance or direction in the conduct, financing or management of the affairs of the criminal syndicate with the intent to promote or further the criminal objectives of the syndicate.

(g)    Intentionally to promote or further the criminal objectives of a criminal syndicate by inducing the commission of an act or the omission of an act by a public officer or employee which violates his or her official duty.

(h)    To transport property, to attempt to transport property or to provide property to another person knowing that the other person intends to use the property to further racketeering activity.

(i)    Who knows that property represents proceeds of, or is directly or indirectly derived from, any unlawful activity to conduct or attempt to conduct any transaction involving the property:

(1) With the intent to further racketeering activity; or

(2) With the knowledge that the transaction conceals the location, source, ownership or control of the property.

(j)    To conspire to violate any of the provisions of this section.

80.    Through the aforementioned predicate acts, DEFENDANTS engaged in conduct that constitutes a pattern of racketeering activity pursuant to Nev. Rev. Stat. § 207.400, including but not limited to:

a. receiving the LOANS with criminal intent that were derived, directly or indirectly, from racketeering activity to use or invest, whether directly or indirectly, any part of the proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of both (1) right, interest, and/or equity in the PROPERTY and (2) operating the fraudulent ALL NET PROJECT (Nev. Rev. Stat. § 207.400(1)(a));

b. through racketeering activity, maintaining an interest in and/or control of the fraudulent enterprise (Nev. Rev. Stat. § 207.400(1)(b));

c. being employed and/or associated with enterprises—such as AN, ANLD, DD, AGS, and MRLLP—to conduct and/or participate directly and/or indirectly in the affairs of the enterprise through racketeering activity or racketeering activity through the affairs of the enterprise (Nev. Rev. Stat. § 207.400(1)(c));

d. intentionally organizing, managing, directing, supervising, and/or financing a criminal syndicate (Nev. Rev. Stat. § 207.400(1)(d));

e. furnishing advice, assistance or direction in the conduct, financing or management of the affairs of the criminal syndicate with the intent to promote or further the criminal objectives of the syndicate (Nev. Rev. Stat. § 207.400(1)(f)); and/or

f. conspiring to violate any of the provisions of Nev. Rev. Stat. § 207.400 (Nev. Rev. Stat. § 207.400(1)(j)).

81.     As a direct and proximate result of DEFENDANTS' violations, PLAINTIFFS suffered injury to their business and/or property, including but not limited to the loss of the principal sum of $2,144,200.00 via the LOANS. These injuries were caused by reason of the racketeering activities and are compensable under Nev. Rev. Stat. § 207.470.

WHEREFORE, Plaintiffs pray for judgment against DEFENDANTS, and each of them, as follows:

///

**ON THE FIRST CAUSE OF ACTION**

1.      For general and special damages in the amount of $2,144,200.00 for the LOANS, trebled to $6,432,600.00 pursuant to 18 U.S.C. § 1964(c);

2.      For general and special damages in the amount of $119,492.50 for the performance bonds, trebled to $358,477.50 pursuant to 18 U.S.C. § 1964(c); For general and special damages in the amount of $150,100.00 for the consideration paid for the equitable ownership interest in the ALL NET PROJECT , trebled to $450,300.00 pursuant to 18 U.S.C. § 1964(c);

3.      For prejudgment as allowed by law;

4.      Order DEFENDANTS to cease and desist from violating 18 U.S.C. § 1964;

5.      For such equitable injunctive and ancillary relief as may be necessary to prohibit the illicit conduct described herein during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, a temporary restraining order and/or a preliminary injunction;

6.      For reasonable attorney's fees according to proof, pursuant to statute or contract, whichever is greater;

7.      For all costs of suit incurred herein; and

8.      For such other relief as this Court deems just and proper.

**ON THE SECOND CAUSE OF ACTION**

9.      For compensatory damages in the amount of $2,144,200.00 for the LOANS;

10.      For compensatory damages in the amount of $119,492.50 for the performance bonds;

11.      For compensatory damages in the amount of $150,100.00 for the consideration paid for the equitable ownership interest in the ALL NET PROJECT;

12.      For treble damages pursuant to Nev. Rev. Stat. § 207.470;

13.      For costs of suit incurred herein;

14.      For reasonable attorney's fees pursuant to Nev. Rev. Stat. § 207.470;

15. For prejudgment interest as allowed by law.;

16. For such equitable injunctive and ancillary relief as may be necessary to prohibit the illicit conduct described herein during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, a temporary restraining order and/or a preliminary injunction; and

17. For such other and further relief as the Court deems just and proper

DATE: September 2, 2025   **LAW OFFICES OF SHAWN R. PEREZ**

By: */s/ Shawn R. Perez*
  Shawn R. Perez, Esq.
  Attorneys for Plaintiffs